## BREACH OF A SALES CONTRACT—INJUNCTIVE RELIEF GRANTED.

Common Pleas Court of Franklin county.

THE SUNDAY CREEK COAL CO. *v.* THE BIG BAILEY COAL COMPANY.

Decided, 1922.

*Contemporaneous Agreements—Where Exhibiting Mutual Purpose may be Treated as One—Power of a Court of Equity to Enforce a Negative Covenant—Injunctive Relief Parallel to Specific Performance When.*

1. Where the facts and circumstances underlying two contractual instruments, and the manner in which the instruments were clearly intended to be performed, disclose a joint and mutual purpose to perform them concurrently, and the provisions of the instruments are not incompatable but can best be effectuated by construing them together, a court will adopt this course in an equity proceeding and the separate instruments will be treated as one.

2. The breaching of a sales contract cannot be justified on the ground that defendant's product was not sold at prevailing prices in accordance with agreement, where no evidence is produced tending to show· that the prices obtained were not assented to by the defendant.

3; A court of equity may enjoin the breach of a so-called negative covenant such as an exclusive sales contract, the jurisdiction in such a case running parallel to that involved in a decree for specific performance, and the plea of hardship where the contract was entered into voluntarily cannot be permitted to prevail.

KINKEAD, J.

Plaintiff seeks equitable enforcement of the contractual obligations of defendant contained in paper writings designated as a "lease to mine coal" and a "sales contract" providing for the sale and disposition of the coal produced from the leased land. Plaintiff's predecessor in title leased the coal lands to defendant's predecessor grantee; the lease and sales contract were negotiated for and the instruments were prepared, signed and executed on the same date, the mutual purpose and effect of their acts being to consummate a single transaction for the

lease of plaintiff's lands for mining coal, and a contract for the sale of the coal. The negotiations for the coal lease and sales contract, their preparation and execution were continuous and concurrent, executed at the same time and bearing the same date.

The case was heard upon application for temporary injunction, and subsequently defendant filed its answer.

Defendant claims that plaintiff breached its contract, and that it thereupon notified plaintiff on April 27, 1921, that it would no longer be bound by the terms of the sales contract.

In a *third defense* defendant claims that it did not give its consent to the assignment by the Ohio Land & Railway Company to the Sunday Creek Coal Company; that the plaintiff was at the time of the assignment of the sales agreement, ever since and is now engaged on its own account, in the mining and production of coal from territory near that of defendant, and is engaged in selling, through its sales department, the coal so produced by it, in competition with the coal of defendant.

In a fourth defense defendant claims that plaintiff has acquiesced in and consented to the refusal of the defendant to be further bound by the contract ever since April 27th, 1921, when defendant notified plaintiff of its intention not to perform the contract until September 2, 1922, when this action was filed.

Defendant's answer, filed since the hearing, expressly claims that plaintiff did not sell the coal at the "best obtainable market prices;" that it did not sell the coal at the "prevailing market prices;" that it failed to procure orders which should have been given defendant— to mines owned and operated by plaintiff.

Defendant complains that plaintiff failed to find a market for its coal when the demand became less active, and when more than sufficient orders were not offered the plaintiff to keep its own mines in full operation.

Defendant's answer also complains that plaintiff sold large quantities of its production to other concerns engaged in identically the same kind of business in which

plaintiff attempted to engage, and performing the func-
tions which plaintiff under the sales contract covenanted
and agreed to perform.

When the instruments were executed it evidently was
known and understood by the parties that plaintiff's
predecessor, was a proprietor and operator of mines and
engaged in selling coal.   One of the inducements for
making the contract was the fact that plaintiff already
had a sales agency equipped and ready for operation.

2.   *Shall the Sales Contract and the Lease be considered
as one transaction in Equity?*

Plaintiff contends that the coal lease and the sales
contract executed on the same date constitutes a single
transaction in equity, that the intent of the parties was
that the grant of the lease to mine the coal was made
contingent upon the grant to make sale of all coal pro-
duced by defendant; that part of the consideration mov-
ing between the parties in the execution of the coal
lease was the grant of the right to plaintiff to make
all sales of the coal so produced.   Though the lease to
mine coal is an instrument pertaining to the grant of
land, the claim nevertheless is that the separate contract
giving plaintiff the exclusive right to make sale of all
coal produced necessarily operated as an essential part
of the consideration of the lease, therefore the two in-
struments constituted a breach of the lease to mine coal.

The sales agreement by its terms made the coal lease
part of inducing cause of the lease, but it also modified
the terms of the lease.   Item 9 of the sales contract
stipulates that if the lessor does not furnish sufficient
shipping orders that the minimum tonnage may be mined
as required by the lease, then such minimum required by
the lease shall be reduced to the extent that the lessee
is unable to mine because of the failure of the lessor to
furnish the stipulated shipping orders.

The primary clause of the sales contract recites the
making of the coal lease "this day taken" "bearing even
date" with the lease.   When the Big Bailey Coal Company
assigned to the Big Bailey Mining Company the same was

made conditional upon the acceptance and the assumption of the sales contract, the assignee being bound thereby to give to the Sunday Creek Company the exclusive right to sell the output of the defendant.

It seems essential also to consider the agreement of plaintiff to build the railway tracks at suitable places so as to enable the lessee—defendant—to dispose of its output to plaintiff according to contract. It does not seem probable that The Sunday Creek Company would have bound itself to build railway facilities for shipping the coal had not the sales contract been made. If the defendant had merely taken the coal lease and had intended to market its own coal, it would have been necessary to have built its own railway facilities for marketing its production. Construction of railway facilities by plaintiff to the mines leased by defendant evidently was expressly designed to enable plaintiff to market defendants production with a view of disposing of it pursuant to the sales contract. Defendant was put to no expense in connection with selling the coal; plaintiff already had the sales agency ready for action, defendant having nothing to do but to produce the coal. Defendant ran no risk of securing payments for the coal plaintiff having guaranteed payments for all coal sold.

The rule in equity is that where two or more instruments are contemporaneously and mutually prepared and executed by two parties, pursuant to a common or mutual intent and design, where the first is made contingent upon the other, or the second is inter-dependent upon the other, and the clear purpose is that the two instruments are to be concurrently executed and carried out, and each is to do the things stipulated shall be done by each and both, equity will impute and infer that the parties thus expressing their purposes mutually intended that the two instruments were to operate and be carried out concurrently, and that the instrument be regarded as one transaction.

There can only be occasion for calling this rule into use when we encounter two such instruments as we have

to deal with in this case.  It matters not whether we have two radically different kinds of instruments, as here the sealed instrument and simple contract, so long as the terms and conditions of the two contracts clearly show a mutual interest to accomplish the joint purposes of the two instruments by the kind of separate and concurrent designs which are so clearly manifested by the lease and sales contract.

The facts and circumstances underlying the contractual instruments, and the special manner in which the two instruments were clearly intended to be executed, carried out and performed discloses a joint and mutual purpose to carry them out and perform them concurrently, and not distinct and separate as the defendant is now attempting to do.

The joint and mutual purpose was, and is that defendant was to perform its separate work of the joint purpose by mining and producing the coal on the premises leased, and that plaintiff was to build and construct the railway facilities, and when defendant had mined and produced the coal, plaintiff was to sell it in the manner provided by the two instruments.

The two instruments expressly provide that under certain conditions the parties may agree that plaintiff shall grant defendant the privilege of selling its own coal.  The facts disclose that the parties expressly agreed to carry out and perform the two contracts according to an express exception contained in the sales contract which provides that defendant may market the coal at certain periods when plaintiff was unable to dispose of all the output.

The parties having thus expressly placed their own construction upon their contracts, it does not lie within the power of one of the parties to deny or contradict such mutual purpose, unless there has been a clear breach of an essential feature of the contract.

The court, therefore, feels bound to so construe their contractual obligations and treat them as one transaction in equity, so that their rights and obligations will thus be determined.

The rule applicable to such instruments is a familiar doctrine and is stated in 6 R. C. L., Section 240, as follows:

"When different instruments are executed at the same time, but are parts of one transaction, it is the duty of the court to suppose such a priority in the execution of them as shall best effect the intention of the parties. (3 Mass. 138, 3 Am. Dec., 98). Moreover, the general rule is that in the absence of anythiny to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in course of the same transaction, are, in the eye of the law, one instrument, and will be read and construed together as if they were as much one in form as they are in substance. * * * The resulting contract is to be determined by a construction of both in accordance with conventional rules. In order to make the rule applicable it is not essential that the two instruments shall be executed simultaneously. * * * When two written contracts are entered into between the same parties concerning the same subject matter, whether made simultaneously, or on different days, they may, under some circumstances, be regarded as one contract, and interpreted together," and cases cited, 13 Am. St. Rep., 344 and note — 100 Am. Dec., 211, 40 Am. St. Rep., 373 and note. 3 Am. St., 62, 50 Am. St., 701; 132 Am. St., 924; 55 An. Rep., 434. (Citations in my own library).

"But this is not the natural construction, and is only resorted to in order to effectuate the intention, and where the provisions of the two instruments, if put together, will not be incompatible." *Id.*

In *Brewing Co.* v. *Schultz,* 68 O. S., 407, 415, it was said:

"The contract and bond relied upon and pleaded, etc., * * * were contemporaneously executed, were parts of the same transaction, and must be construed together as one instrument."

In *Kundtz* v. *Van De Boe,* 24 C. C. (N. S.), 139, Affd. 70 O. S., 485, it was said:

"The plaintiff claims that these two contracts constitute one contract; that they together form part of the consideration that induced the purchase of the lot. We are

satisfied that these two contracts were held out as an inducement to the party purchasing the lot; that they both entered as a consideration for the payment of the money paid on the lot.  *  *  *  This makes the two contracts but one contract in fact; they become parts of one and the same contract."

### 3.  HAS DEFENDANT BREACHED ITS CONTRACT?

Having concluded that the contractual obligations of the parties are to be treated as one transaction in equity, the remaining task is to determine whether the defendant or plaintiff· has been guilty of a breach such as will warrant the court in granting equitable intervention by restraining the acts of the defendant complained of by plaintiff.

The inquiry must therefore be whether the defendant has been guilty of breaking its obligations imposed by the two concurrent instruments of writing which the court concludes constitute one transaction in equity.·

Has defendant breached the contract by failing and refusing to turn over to plaintiff the privilege granted to make all sales of the coal produced by defendant from the coal lands demised by plaintiff to defendant?

The obligation imposed by the single contract in equity is that the defendant shall turn over to plaintiff all coal produced for sale, which plaintiff is required to make in the open market at the best obtainable prices *to be agreed upon by both parties,* and at the prevailing prices.

The court is of the opinion that the evidence offered by affidavits disclosed that up to a certain period, the parties mutually carried out and performed their respective obligations, and that the coal was sold by acquiescence in the prices at which the same was sold and that it was sold at the prevailing prices.

It may be difficult to follow the course pursued by the parties in all the transactions of performance, but upon the whole evidence, it seems clear that the dissatisfaction, and the disagreements, have arisen from a belief on the part of the defendant that it has not gotten the prevailing prices.  But so far as the court is able to discover it

seems rather clear that the plaintiff made the sales according to the prevailing prices as appears from the affidavits.

It will not be denied successfully, at least, as it appears from the affidavits that the plaintiff sold the coal of defendant at the prevailing prices.

The claim of defendant is that the evidence offered by defendant has reference to coal sold by defendant which has been produced by plaintiff's other lessees upon other lands leased by it to its other tenants.

One contention of defendant respecting the best price obtainable is to be determined by the price which the person to whom the jobber sells it, or what the producer's agent gets from the local retailer, and that the plaintiff was a jobber for defendant; that plaintiff was to sell defendants coal in the same manner in which it sold its own.

Plaintiff as sales agent necessarily sold at wholesale; it might be to jobbers, direct to large consumers, or to retail dealers. The best price obtainable, or prevailing price would *prima facie* seem to be at the price which plaintiff with defendant's consent, express or implied, sold the coal.

*Defendant has not produced proof to show that the prices at which plaintiff sold coal was not assented to by it; it may be assumed that it was.*

The claim of defendant's brief (p. 3) is that the sales contract was craried out up to April 27, 1921; that beginning in April or May, 1920, and throughout that year plaintiff failed to obtain the prevailing market prices; that it was sold to other jobbers at less than the prevailing prices.

It is claimed that after the drop in the market plaintiff failed completely to furnish any orders so that defendant was unable to operate; that all the coal sold during that period came from its own mines which worked every day.

Defendant admits that sometime after July, 1919, the Sunday Creek Company notified defendant it could sell its own coal up to December 31, 1919; it admits, and

defendant now states that plaintiff resumed the sale in 1920 but sold much of the coal to jobbers at a price which defendant says it was offered net from other sources.

Counsel for defendant state that in December, 1920, the demand for coal again slumped, plaintiff being unable to secure sufficient orders to operate its own mines and those of defendant which were closed.

In early 1921 defendant says it was offered a Lake coal contract, at a price which would enable it to resume operations and stop the losses which it was sustaining. At the time of accepting the Lake orders, April 27, 1921, defendant notified plaintiff that it had determined to operate its mines and sell its coal on its own account.

Defendant justifies its action in repudiating the contract solely by the claim that plaintiff did not furnish orders, and that the sales were not made at prevailing market prices.

                    *     *     *     *     *     *

| 1920 | High | Low | Average |
|------|------|-----|---------|
| January | $2.50 | $2.50 | $2.50 |
| February | 2.50 | 2.50 | 2.50 |
| March | 3.00 | 2.50 | 2.77 |
| April | 4.25 | 3.50 | 3.90 |
| May | 5.75 | 4.00 | 5.08 |
| June | 7.80 | 5.75 | 7.22 |
| July | 8.00 | 7.50 | 7.71 |
| August | 8.50 | 6.25 | 7.04 |
| September | 8.50 | 6.50 | 7.00 |
| October | 6.50 | 6.50 | 6.50 |
| November | 4.92 | 4.92 | 4.92 |
| December | 3.70 | 3.70 | 3.70 |

Defendant also offers as Exhibit B in Eberle's affidavit the following:

| 1920 | High | Low | Average |
|------|------|-----|---------|
| March | $3.50 | $2.25 | $2.43 |
| April | 3.75 | 2.60 | 3.20 |
| May | 5.50 | 2.60 | 3.97 |

| June | 4.00 | 4.00 | 3.60 |
|------|------|------|------|
| July | 4.00 | 4.00 | 3.60 |
| August | 7.00 | 4.00 | 5.28 |
| September | 7.00 | 7.00 | 6.30 |
| October | 7.00 | 7.00 | 6.30 |
| November | 7.00 | 4.00 | 5.06 |
| December | 6.00 | 1.75 | 3.90 |

## EXHIBIT C.

Prices paid different Jobbing Companies to the Keystone Coal Company:

| 1920 | High | Low | Average |
|------|------|-----|---------|
| March | $3.00 | $3.00 | $3.00 |
| April | 4.25 | 3.50 | 4.00 |
| May | 5.75 | 4.00 | 4.81 |
| June | 7.75 | 6.00 | 7.18 |
| August | 8.50 | 6.25 | 7.36 |
| September | 8.00 | 6.25 | 7.33 |
| October | 7.44 | 6.25 | 6.97 |
| November | No rates given. | | |
| December | 5.00 | 3.00 | 3.68 |

C. C. Sharp testifies that the average market price was as follows (average market price during 1920):

| January | $4.25 | $ |
|---------|-------|---|
| February | 3.25 | |
| March | 4.75 | |
| April | 8.00 to | 9.00 |
| May | 8.00 to | 9.00 |
| June | 8.00 to | 9.00 |
| July | 8.00 to | 9.00 |
| August | 8.00 to | 9.00 |
| October | 8.00 to | 9.00 |
| November | 8.00 | |
| December | 7.00 | |

C. H. Roudebush, auditor of defendant, testifies by affidavit that he kept an accurate record of all coal sold and

the price paid for the same, and that the average price received by defendant was as follows:

| 1919 | |
|---|---|
| July | $2.10 |
| August | 2.15 |
| September | 2.54 |
| October | 2.82 |
| November | Strike |
| December | 2.90 |
| **1920** | |
| January | $2.96 |
| February | 2.95 |
| March | 2.95 |
| April | 3.50 |
| May | 4.76 |
| June | 6.49 |
| July | 6.90 |
| September | 6.90 |
| November | 5.39 |
| December | 3.99 |
| **1921** | |
| January | $3.12 |

The affiant avers that the prices secured by plaintiff were lower than the best obtainable prices; that during February, March and April, 1921, plaintiff failed to give defendant any orders for coal, but sold its own coal, from that time to the present.

The affidavit of John S. Jones relates something of the history of the coal sales during 1918 and 1919 when the railroads were in the hands of the Federal Railroad Administration when bids were called for. Plaintiff made a bid and called upon operators to make bids. Plaintiff's bid for upwards of 1,500,000 tons at $1.88 to be furnished railroads was accepted, and notified each of the persons for whom it had sales contracts to ascertain whether they desired to participate, to which defendant answered that it desired plaintiff to apply 100% of the output of its mine

until May 16, 1919, upon the basis of reduction of the rate of commission.

The affidavit of Mr. Jones recites the acts of the Federal fuel administrator in respect to fixing maximum prices, and the warning against profiteering; that prices fluctuated, and a shortage of coal occurred, prices running as high as $8.00 and $9.00.

Mr. Jones states that plaintiff resolved that it would keep the prices of its own coal lower than the profiteering prices of $8.00 and $9.00, selling some as high as $5.00 and $6.00 when the cost was forced up by scarcity of cars.

Mr. Jones testifies that during all this time defendant urged plaintiff as its sales agent to obtain the highest market prices, and that most of defendant's coal was, under such urging, sold at about $7.00 per ton. He states that defendant was nevertheless dissatisfied with the exorbitant prices, and by letter demanded that plaintiff obtain higher prices, at which time the Sunday Creek was getting only $4.50 for its coal.

The letter of May 18, 1920, by plaintiff to defendant is significant in that it discloses some friction, but though complaining about prices still defendant did not appear to be expressing its view about the specific price. Plaintiff's letter quite plainly reminded defendant that (quoting from its letter to defendant) :

"The coal situation at this time, presents a serious problem. The Lever Act is in force, there is a government regulation against profiteering, and when President Wilson suspended the powers of the Fuel Administration Board he warned all producers against taking too high a price for their coal. There are, as you know, indictments against some coal producers and dealers."

The letter expresses plaintiff's willingness to follow the wishes of defendant, at the same time making it clear that each person must determine the price for himself, and take the responsibility.

Defendant's answer disclaimed desiring the highest price obtainable, professing to be desirous of using the

language of the contract. The significant thing in this letter is the expression of its desire that plaintiff surrender the selling contract. This letter was dated May 19, 1920, and during the latter part of that year there was a slump in coal and the early 1921 the Lake contract was offered defendant.

Giving attention to the affidavits by plaintiff in opposition to defendant's claim concerning the failure of plaintiff, we have that of C. C. Cook, treasurer of plaintiff; he states that the prices given by Roudebush are not true, a statement of the prices being attached to the affidavit showing the prices.

The following is a synopsis of Cook's (2) affidavits showing the prices of sales by plaintiffs for coal produced at the mines stated.

| 1919 | Big Bailey | Snow Fork | Love Bros | Chauncey Co. | Schrodler |
|---|---|---|---|---|---|
| July | $2.20 | $1.92 | $ | $1.88 | $ |
| Aug. | 2.25 | 1.90 | 1.88 | 1.93 | |
| Sept. | 2.63 | 1.97 | 2.15 | 2.38 | |
| Oct. | 2.92 | 2.07 | 2.50 | 2.60 | |
| Nov. | Strike | | | | |
| Dec. | 3.01 | 2.35 | 2.50 | 2.88 | |
| 1920 | | | | | |
| Jan. | $3.05 | $2.31 | $2.59 | $2.90 | $ |
| Feb. | 3.06 | 2.34 | 2.50 | 2.90 | 2.50 |
| March | 3.05 | 2.33 | 2.52 | 2.90 | 2.50 |
| April | 3.60 | 3.50 | 3.21 | 3.50 | 3.50 |
| May | 4.86 | 4.24 | 4.21 | 4.73 | 4.63 |
| June | 6.58 | 6.09 | 5.52 | 6.57 | 6.61 |
| July | 7.00 | 7.00 | 5.91 | 7.00 | 7.00 |
| Aug. | 7.00 | 7.00 | 5.57 | 7.00 | 6.49 |
| Sept. | 7.00 | 7.00 | 5.94 | 7.00 | 7.00 |
| Oct. | 7.00 | 7.00 | 6.00 | 7.00 | 7.00 |
| Nov. | 5.49 | 5.38 | 4.61 | 4.95 | 5.40 |
| Dec. | 4.41 | 3.65 | 3.47 | 4.28 | 3.22 |
| 1921 | | | | | |
| Jan. | $3.71 | $ | $ | $3.65 | $2.75 |

Then there are the affidavits of John M. Taylor, a retail dealer, and a number of other persons which support the statements of Cook, and which tend to show that plaintiff sold the coal at the current and prevailing prices in each and all instances. The affidavit of James R. Fitzer denies that plaintiff took all of the orders obtained by it for its own mines; that offers of orders were made but that defendant refused them because it declined to sell it coal at the then market prices; that in April it reopened its mines April 25, 1921, and commenced to sell its own coal. It is stated that permission was given to defendant to sell its own coal from time to time during the continuance of the contract.

There are other affidavits to the effect that plaintiff sold the coal at the prevailing prices.

The affidavit of John M. Taylor, a retail dealer, states the prevailing prices in June 1920, $4.50, $4.75 and $5.50. July 1920, $4.50, $4.75 and $5.00. August 1920, $4.75 and $5.00. September 1920, $5.00. October 1920, $5.00.

After a full review of the evidence the court held:

The finding of the court is that it has not been successfully shown that plaintiff failed to get the best obtainable price, or the prevailing price.

There is one striking failure on the part of defendant, in that it has not in any wise shown that it failed to agree on the prices at which coal was to be sold which constituted an essential element of the contract.

Take for instance the controversy during the administration of the fuel administrator; the correspondence between the parties did not put the defendant in a favorable light. It was evidently desirous of getting higher prices at that particular period, whereas plaintiff was giving special consideration to prevailing conditions. Defendants last letter to plaintiff disclosed acquiescence on its part.

In respect to the claim that prices at which plaintiff sold coal was somewhat dependent upon the prices at which plaintiff sold coal for other lessees similarly situated with defendant, it may be said that this situation was evidently known, understood and acquiesced in continu-

ously by the conduct of both parties in their attitude concerning the prices.

The prices at which the coal was to be sold undoubtedly was such prices as producers sold to jobbers and dealers, and not the price paid by retail dealers to jobbers and dealers.

The finding of the court upon the claims and the evidence submitted is that defendant has breached its contract without adequate ground in fact and law.

4. *What Relief may be Afforded?*

Having come to the conclusion that defendant has breached its contract, the important remaining problem is concerning the relief that may be afforded.

Assuming that it now appears, and that it may appropriately be found and determined upon final hearing, that defendant has breached its contract, will the court be warranted in granting temporary injunctive relief prohibiting defendant from continuing further to carry out the contract made with another party to take its entire output of coal?

Should a temporary injunction now issue restraining defendant from selling or marketing the coal produced from the leased premises, or from selling or marketing it through any other agency than plaintiff?

To make such an order would require the court to enjoin defendant from making sales of its coal produced to another person or company than plaintiff; it would require defendant to cease selling its coal to any other person or company than plaintiff; it would require defendant to cease its alleged negative acts in breach of the contract.

An accounting is asked as to all coal mined by defendant and sold by it through another agency.

Assuming that defendant has breached. its contract should the decree be confined merely to an injunction against defendants further continuance in selling its output to other parties than plaintiff?

Or may the court broaden its powers on the theory that the transaction—the lease, the furnishing of railway

facilities and the sales contract—are to be considered in equity as one, therefore equity may take cognizance of the coal lease, the construction of railway facilities, and the sales contract, and settle all the rights of the parties in one action—this action?

Counsel for plaintiff introduce the subject of enforcement of a negative contract on the theory that there is occasion of equitable intervention to prevent defendant from performance of acts in negation of the affirmative obligations of the contract.

In every contract imposing affirmative obligations an inferential negative negative obligation is present that a party shall not commit acts in negation of affirmative covenants.

However, in this case defendant appointed plaintiff its sole and exclusive agent for sale of all coal produced under the lease, and by Item 9 specifically agreed *not to market any coal except through plaintiff, without plaintiff's permission.*

A party has the right to have a contract specifically performed, when unenforceable at law, in such way as to adequately assess damages at law.

If we are right in assuming that all the contractual obligations of the parties touching the lease, the construction of the railway facilities, and the sale contract, are of such character that the fundamental rights of either party cannot be adequately guarded, protected and enforced in an action at law, then it must be decided that the equitable remedy is exclusive.

The sole act of alleged breach now before the court is the failure of defendant to allow plaintiff to make sales of the coal produced.

If plaintiff had undertaken to recover damages at law it would have been utterly impossible to have reached a satisfactory conclusion of how much coal might have been produced from the leased premises.  Furthermore pursuing such an action would leave defendant in possession of the leased premises, with plaintiff's capital invested in railway facilities remaining idle.   Plaintiff would be com-

pelled to institute another action to have its rights determined in the lease and the railway equipment.

Pursuit of the single action in equity by application of the equitable principle that where two instruments, such as the lease and sales contract and the railway facilities, places the complete transaction before a court of equity in such way that the full and just relief may be afforded.

Defendant should not be allowed to hold the lease, and have the use and benefit of the railway facilities, unless it carries out its part of the contract in respect to the sale of the product. The lease, the construction of the railway facilities, and the sales contract were all executed with the single purpose of mining and selling the coal in the manner provided, and at the prices agreed upon by the parties. And defendant cannot be allowed to take the position that it has—on no firmer ground than disclosed—when it is bound to make a reasonable effort to agree upon the price at which the coal is to be sold, and thus undertake to repudiate the sales contract, and still hold, use and enjoy the railway facilities constructed at large cost by plaintiff, in consideration of the execution of the lease and the sales contract, and to keep possession of the leased premises.

In this action, therefore, the court may undertake to do full justice to both sides, first by giving proper recognition to plaintiff's rights in the lands, in the coal unmined, in the railway equipment constructed without any cost to defendant, but in consideration of the lease and the sales contract and its continuous performance.

It would be within the power of the court to give the option to defendant to cease its operation of the contract made with others for disposition of its output, return to its performance of the contract, account for any profit that plaintiff may have made had defendant not breached its sales contract, or give up all rights.

If defendant does not desire to pursue such an alternative course, then may the court be justified in deciding that defendant breached its sales contract, which in equity was such an integral part of the complete purposes of the

parties, that defendant cannot be permitted to hold and use the rights and privileges thereby granted, except by also performing all the obligations imposed upon it under the sales contract, which together with the transaction of construction of the railway facilities constituted part of the whole and complete transaction of the parties, which they clearly intended by their contractual obligations to be for the single purpose of *mining and selling coal.*

Plaintiff is asking the court to require defendant to do equity by returning to the performance of its contract, or give up its right to hold the lease and right to mine coal. It must therefore appear that to call upon defendant to cease selling coal through another agency, or give up its mining lease, may not work any needless hardship, but that such action will constitute the sole and adequate relief in equity which will adequately protect the rights of plaintiff.

As stated by Story the jurisdiction of courts of equity to decree specific performance of contracts is not dependent upon or affected by the form of character of the instrument. (Sec. 991.) A court of equity looks to the substance, purpose and *effect* of an instrument, or to two or more instruments, where the intent of the parties clearly appears that such two instruments—though one be a real contract and the other a mere personal one—nevertheless they are intended to effectuate and accomplish a single purpose to mine and market the coal produced.

Special stress is laid by plaintiff's counsel on the matter of enjoining the breach of a negative covenant. Such negative covenant is found in clause 9 of the sales contract which provides that during any time when the lessor and sales agent is unable to market all coal produced, it may grant defendant the privilege to mine such coal as the lessee and sales agent is unable to mine for a period not to exceed ten days, which may be renewed from time to time for like periods until the lessor is again able to market such entire output, *"after which the Big Bailey Company shall not market any further coal except through the Ohio Land Company as herein provided.*

This constitutes a clear negative contract binding defendant not to market any coal through any other agency than plaintiff, except the periods when defendant may be allowed to market its own productions.

The doctrine is that equity will enjoin a breach of a contract, even though the nature of the contract is such that specific performance may not be enforced.   14 R. C. L., 82, p. 381.

"An injunction against the breach of a negative contract is in effect enforcing specific performance. . The general principles upon which the two remedies are granted are in the main the same, and where a contract is one of a class that will be specifically enforced, equity will enjoin a breach."   22 Cyc., 844.   See also pp. 845, 846."

In *Brewing Co.* v. *Koust,* 12 C. C. (N. S.), 577, page 581, affd., 79 O. S., 469, the court held that though damages may be allowed for past breaches, where there is a future violation, plaintiff's interests and rights will be protected by injunction.   See *Brewing Co.* v. *Kravel,* 16 O. C. C. (N. S.), 292; 82 O. S., 395; *Rogers* v. *Railway,* 12 O. D., 136, 140; Pomeroy Eq., Sec. 296; High on Inj., Sec. 1164.

In *Butterick Pub. Co.* v. *Loeser & Co.,* 232 N. Y., 86, it was held that:

"A court of equity may restrain the breach of a so-called negative covenant such as the breach of an exclusive sales contract by the agent by selling competing goods."

In 14 Ruling Case Law, Sec. 82, the text states that equity will in a proper case enjoin the breach of a contract, notwithstanding the fact that the nature of the contract may be such that the specific performance could not be enforced.   7 L. R. A., 381; 134 Am. St. R., 88; 44 O. L. R., A. 98; 120 Am. St. Rep., 344; 7 L. R. A. (N. S.), 726; 3 Ann. Cas., 975, note; notes 36 Am. St. R., 349; 90 Am. St. Rep., 635.

The jurisdiction which the court exercises is in substance the same as where its jurisdiction is invoked to aid a complainant by a degree of specific performance,

since enjoining the breach of the contract operates as a negative enforcement of its terms. 14 R. C. L., Sec. 83; 134 Am. St. Rep., 88; 36 Am. St., 345, and note. Notes 90 Am. St., 635; 140 Am. St., 57.

The court is guided by the same general rules determining the right to an injunction as when decreeing specific performance. *Fowler's Utilities Co.* v. *Gray,* 168 Ind.,1, 120 Am. St., 344.

### INJUNCTION ALLOWED.

Having thus far resolved the questions favorable to plaintiff the question now is whether a temporary injunction should be allowed preventing the defendant's further continuance in selling its production of coal to persons other than plaintiff.

The consequences of such action are of such character that it may probably suddenly put a stop to the continuance of defendant's business of mining coal; to make the order effective for purposes of this action the order of injunction would require defendant to further cease disposing of its output to any other person or company than plaintiff. The logical result of such an order would require defendant to specifically perform its contract by turning its production over to plaintiff or to cease operation altogether.

However, the rule is that hardships, fairly and voluntarily assumed as part of the contract which is sought to be enforced, cannot prevail to stay a specific performance. Story's Eq., Sec. 1019. *Bosch Magneto Co.* v. *Rushmore,* 85 N. J. Eq., 93; *Marvel* v. *Jonah,* 83 N. J. Eq., 295, L. R. A. 1915B, 206.

A temporary injunction may therefore be allowed, upon plaintiff's giving bond in the sum of $——, restraining defendant from further making any sales of its production of coal from the premises leased to any person or company other than plaintiff.

The restraining order shall not go into full force and operation until November 1, 1922 ,at which time it may become effective.